HAWTHORNE, Justice.
Defendant, R. O. Roy, has appealed to this court from a judgment of the First Judicial District Court for the Parish of •Caddo ordering him to file a complete and *231 detailed accounting showing the total cost of drilling an oil and gas well designated as Dunn-Olsen Well No. 1 and showing all amounts received by defendant and by DeSoto Oil & Gas Company, Inc., from the sale and production of the well, and, further, recognizing that defendant owed to plaintiff, James Warnock, Jr., a sum equal to the proportion of all sums received by the defendant and the DeSoto Oil & Gas Company, Inc., from the sale of the well and from the production therefrom that $5000.00 bears to the total cost of drilling the well.
The material facts are as follows: On July 23, 1934, defendant, R. O. Roy, obtained an oil and gas lease from Dunn and Olsen. He thereafter on December 3, 1935, assigned this lease, with others, to the DeSoto Oil & Gas Company, Inc., of which he was president and principal stockholder, for a stated consideration of $3911.49 in cash and three-fourths of whatever might be derived from the drilling and operation of the properties so transferred. Subsequently, Charles Fearon, an' oil financier of Philadelphia, entered into an agreement with Roy to assist financially in the development of this lease, each to contribute $15,-000.00. Fearon suggested that James Warnock, Jr., be permitted to enter the venture by assuming $5000.00 of Fearon’s contribution, and Roy wrote Fearon on July 11, 1936, that “It will be perfectly agreeable to have Mr. Warnock join in drilling the Bistineau well to the extent of $5000.00”. Fearon forwarded $10,000.00 for this venture on July 9, 1936, and Warnock sent his check for $5000.00 to Roy on July 16, 1936. In the letter enclosing this check Warnock informed Roy that the amount thereof was to pay for a "$5000.00 interest in the well which you are drilling in which Mr. Charles Fearon has a $10,000.00 interest”. Roy by letter acknowledged receipt of this sum of money, to be used for the purposes outlined in Warnock’s letter of July 16, and subsequently deposited it to his own account, (All italics ours.)
Roy, as president of the DeSoto Oil & Gas Company, Inc., secured that company’s participation in the cost of drilling the well, and it was to pay the costs in excess of the $30,000.00 contributed by Roy himself, Fearon, and Warnock. On July 20, 1936, a permit was issued to the DeSoto Oil & Gas Company, Inc., to drill the well on the Dunn-Olsen tract, and drilling was commenced by Roy or his drilling company on the same day on which the permit was issued.
On October 6, 1936, the defendant Roy wrote to the plaintiff Warnock, giving him the location of the Dunn-Olsen Well No. 1, and among other things stated that the well "in which you have an interest, obtained a depth of 2800' on October 4th * * *”. Again, on December 15, 1936, defendant wrote plaintiff, informing him that the well had been drilled to a depth of 5235 feet to the Pettit sand in the Sligo *233 field, and stating that “On Thursday December 10th we began to set 7" casing in the Dunn & Olsen well in which you have an interest and finished early Friday morning”. The well was completed in January, 1937, and on January 15, 1937, defendant Roy informed the plaintiff that “the Dunn & Olsen well of which you are a part owner was drilled to a total depth of 5236' and has been completed ás a medium size gas well with some dark colored distillate in the gas. This distillate can be separated when we begin to market the gas. Temporarily there is an over supply of gas in this territory but in the course of event there would be a demand for it and we will expedite that much as possible. The well was completed in what is called the Pettit sand in the Sligo field”. After completion as a producer, this well was immediately closed in for want of a pipeline outlet.
On February 25, 1937, defendant again wrote to plaintiff, informing him that another well would be drilled in the neighborhood of the Dunn-Olsen Well No. 1, "of which you are part owner”, and inviting plaintiff to join in the drilling of the new well in such amount as he might choose. Later, on November 26, 1937, defendant again wrote the plaintiff that, due to an overwhelming amount of gas produced in the vicinity, there was no immediate prospect of making any money out of the Dunn-Olsen investment, but that "In the course of time we will get some money out of this gas but it ccmnot be done immediately and am writing you this to keep you posted”.
On December 22, 1937, almost a year after the completion of the well, the DeSoto Oil & Gas Company, Inc., through its president, defendant herein, transferred the Dunn-Olsen well and the lease under which it was drilled, together with a large number of other leases, to the Union Producing Company for the express consideration of $100,000.00 cash. By an operating contract of the same date the assignee further agreed to pay an additional sum of $150,000.00, payable in three installments of $50,000.00-each, due in one, two, and three years after date. This contract provided an additional consideration of the payment of one-half cent per thousand cubic feet of gas and 25 per cent of the net proceeds derived from the sale of gasoline extracted from the gas.
On March 16, 1938, Roy executed an affidavit stating that, out of the cash received by the DeSoto Oil & Gas Company, Inc., from the Union Producing Company, he had received certain cash payments equal-ling three-fourths of the cash received by the DeSoto Oil & Gas Company, Inc., and that this affidavit was executed to acknowledge receipt of those moneys and give complete acquittance for them. Thus, as found by the trial judge, “ * * * although the Dunn-Olsen well has been conveyed to Union Producing Company, the record shows that Roy has received three-fourths of the cash payments called for in the conveyance and operating agreement, as well *235 as the current monthly payments from production of the well since January, 1940.” These payments were received by Roy from the DeSoto Oil & Gas Company, Inc., of which, as stated previously, he was president and principal stockholder.
In January of 1940, a pipeline connection for the Dunn-Olsen well was made, and it has been producing since that time and was still producing at the time of the trial.
After the completion of the well and up to a short time prior to the institution of this suit, numerous letters were written by the parties to each other. In one dated January 16, 1937, defendant informed plaintiff that the task was to get a market for the gas from this particular well, but that he had no doubt this would be accomplished in time. On September 30, 1940, Warnock wrote the defendant, desiring to know whether the gas line had been completed to the well, and whether any of the gas therefrom was being sold. In reply to this letter Roy informed the plaintiff that the pipeline had been completed, and that the proposition was going to make some money in the course of events, but that “all gas properties are desperately hard and slow to get money out of”.
There is also a letter to Roy from plaintiff under date of November 19, 1945, in which plaintiff inquired whether there was any chance of his getting any part of the income from the Dunn-Olsen well. If there was ever any reply to this letter, we fail to find it in the record. On February 19, 1947, an attorney representing plaintiff wrote to defendant, requesting, among other things, to be advised what was the aggregate income from the Dunn-Olsen property from July, 1936, where the funds were at present, and whether there was any pending legal proceeding which would prevent the immediate distribution thereof. Since plaintiff did not receive a reply to this letter, the defendant was informed by another letter on March 7, 1947, that, unless the information requested was furnished, suit would be instituted, and the present suit was filed on September 8, 1947.
Plaintiff in his original and supplemental petitions, among other things, prayed for an accounting by the defendant of the proceeds from the well .allegedly received by the defendant and for a judgment against defendant for plaintiff’s proportionate part as disclosed by such accounting. He prayed also for an undivided one-sixth interest in the well and in all oil, gas, and other minerals recovered from the property and for the defendant to be ordered to execute an assignment thereof; but, at the beginning of the trial on its merits, all claims except for an accounting and for judgment against the defendant for the amount disclosed to be due by such accounting were abandoned.
It is defendant’s contention that he and Fearon both owned, or were interested in, large tracts of land or mineral rights in the Lake Bistineau area, in which the property covered by the Dunn-Olsen lease was sit *237 tiated, and that for the purpose of developing these properties they entered into an agreement designated by the oil fraternity •as a “dry hole” agreement to drill a test ■well under the Dunn-Olsen lease in the hope of enhancing the value of their respective properties; that for the purpose of drilling this well Fearon and the defendant were each to put up $15,000.00 and the DeSoto Oil & Gas Company, Inc., the balance of the drilling costs; that under this agreement the well was to be drilled to the Jeter sand, which is found in this area at a depth of about 4200 feet; that accordingly Fear-on put up $10,000.00, defendant $15,000.00, plaintiff $5000.00, and DeSoto Oil & Gas Company, Inc., the balance; that the well was drilled down to the Jeter sand, and no oil or gas was found; that thereafter the drilling was continued, and the well was completed as a producer in the Pettit sand, found at a depth of about 5235 feet.
Defendant argues that under this agreement he obligated himself to cause the well to be drilled only to a depth sufficient to test the Jeter sand, and that he as well as all other contributors would be reimbursed the amount of their contributions only in the event production was obtained at or above the Jeter sand, and that, since production was obtained only below that depth, plaintiff is not entitled even to a return of his investment.
Under the facts of this case, there is no merit in this contention, which appears to us to be merely an afterthought of defendant, for he himself, after the well was completed as a producer in the Pettit sand, in his correspondence with plaintiff repeatedly referred to the well as one in which plaintiff had an interest and of which he was part owner, and stated and reiterated that in the course of time plaintiff would get some money out of the production therefrom, and that the property would make money in the course of events.
In his reasons for judgment the trial judge applied the rule of interpretation of contracts as laid down by Article 1945 of our Civil Code, and stated that he was of the opinion “ * * * that, when Warnock transmitted his $5000 to Roy and stated in his accompanying letter that same was ‘to pay for a $5000 interest in the well which you are drilling’ and, when Roy acknowledged receipt of the letter and of the check ‘to be used for the purposes outlined in your letter’, the true intent and interest of the parties was, not that Warnock should thereby acquire interest in the sense of title, in the well itself, but rather an interest in the financial returns and profits from the well. Under his reserved rights, Roy could deliver the latter, but not the former, because the contemplated well was to be drilled by DeSoto Oil & Gas Co., Inc., on a leasehold then owned by it and would therefore belong to that corporation. * * * ”
An analysis of the entire record shows that, when Warnock contributed his $5000.00, he entrusted Roy with the full management and control of this entire proj *239 ect. The well was to be drilled by Roy himself or through one of his companies, and he brought about the assignment to, as well as the operating agreement with, the Union Producing Company. Furthermore, in his testimony Roy admits that as a result of these transactions he has received a portion of the total consideration therefor, as well as the current monthly payments for production from the well since January, 1940, from the corporation of which he is president and principal stockholder, DeSoto Oil & Gas Company, Inc., which owned the lease on the property at the time the well was drilled. The repeated admissions of Roy in his correspondence with the plaintiff conclusively prove that Warnock had an interest in the project, and Roy must now account to Warnock for all funds received by him as a result of the drilling of the Dunn-Olsen Well No. 1, and Warnock is entitled to his proportionate share thereof.
To determine plaintiff’s proportionate share of the revenues received by defendant, we must again examine and consider the agreement 'between Fearon and the defendant. According to Roy himself, the DeSoto Oil & Gas Company, Inc., was a party to this drilling agreement and was to pay all costs of drilling the well in excess of $30,000.00, the total cost of the well being, according to Roy, the sum of $51,955.22.
As heretofore stated, Fearon wrote to the defendant, asking whether it would be agreeable to Roy for Warnock to contribute $5000.00 in the drilling of the well. In reply Roy wrote Fearon that it would be perfectly agreeable to him to have Warnock join in drilling the well to the extent o£ $5000.00. In other words, Fearon contributed $10,000.00, Warnock $5000,00, defendant Roy $15,000.00, and the DeSoto Oil & Gas Company, Inc., the balance. The trial judge said in his written reasons for judgment'that, under these circumstances, “We-think the true intent of the parties was that each should share in whatever might be derived from the well in the way of financial returns and profits in the proportion that his contribution bears to the total cost of drilling the well”, and he rendered judgment accordingly. We fully agree with-this conclusion.
Defendant contends that this finding is. erroneous because the trial judge was actually reforming the contract between the parties, and no reformation was prayed for. Defendant is in error. The court was. not reforming the contract, but was interpreting it to find the true intent of the parties.
Defendant also urges in this court an exception of no cause of action, based on the assumption that plaintiff in his petition has alleged the existence of a joint venture or particular partnership, as defined by Article 2835 of the Revised Civil Code, and that the parties to this joint venture owned a real right, an oil well; that proof of the existence of such partnership or joint venture must 'be in writing, and parole evidence is not admissible to establish it.
*241 The answer to this contention is that plaintiff’s suit was also for an accounting .and for a personal judgment against the defendant for any amount that may be shown to be due him as a result of such ac■counting, and that all claims to be recognized as the owner of a' real right were abandoned.
This court in a recent case held that a suit will not be dismissed on an exception of no cause of action directed at a petition where plaintiff’s allegations of fact set forth a ■cause of action as to any part of the demand. .See Ingersoll Corporation v. Rogers, 217 La. 79, 46 So.2d 45, and authorities therein ■cited.
The defendant also urges an exception of no right of action, on the ground that the plaintiff had conveyed his interest in the Dunn-Olsen well to Fearon prior to the institution of this suit, and that he therefore had no right to bring the action. Defendant admits that he has failed to sustain the burden of proving that Warnock had disposed of his interest, but he argues that the burden should be on the plaintiff to show that he had not disposed of his interest, since he is more cognizant of the facts necessary to decide this issue, and that, since plaintiff has failed to discharge this burden, the exception should be sustained.
We do not consider that these facts were exclusively in the control of the plaintiff, and no attempt was made by the defendant to show that the facts could not have been produced by him. We do not consider this a proper case to place the burden of proof on plaintiff in an exception of no right of action filed by the defendant, and on the showing made the exception is without merit.
We have before us also a plea of prescription of 10 years, under Article 3544 of the Revised Civil Code. The basis of this plea is that plaintiff’s cause , of action for an accounting is a personal action which prescribes in 10 years; that the contribution of $5000.00 was made by plaintiff on July 16, 1936, and that, since more than 10 years intervened before his suit was filed on September 8, 1947, the plea should be sustained and plaintiff’s suit dismissed.
Defendant has not made it clear on what theory he contends that the period of prescription began to run on July 16, 1936. Many times after this date defendant admitted that plaintiff had an interest and that he would in course of time get some money out of the production from the well. In fact, the whole tenor of defendant’s letters was calculated to lull plaintiff into a false sense of security so that he would not ask for an accounting, since defendant reiterated that no profits had as yet been realized and that none could be expected until he had, at some future date, found a market for the gas. The first demand for an accounting was made on defendant on February 19, 1947. Certainly the obligation of defendant had not matured prior to this time, nor had he in any way repudiated it. *243 Prescription therefore did not begin to run at the time alleged,
The defendant urges also that the plaintiff is guilty of laches because he delayed in bringing the suit until after Fearon and Fearon’s attorney had died, both of whom, defendant points out, would have been key witnesses in the case. Both of these men died several years before the action was brought, and the defendant did not refuse to recognize plaintiff’s interest until shortly before the suit was instituted. The plea of laches therefore is not well founded.
For the reasons assigned, the judgment is affirmed at appellant’s costs.